# United States Tax Court

T.C. Memo. 2025-25

GENIE R. JONES, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 17165-19, 17169-19,
17177-19, 17178-19,
17187-19, 17201-19,
17205-19, 17206-19.

Filed March 25, 2025.

———————

*Philip Garrett Panitz* and *Matthew J. Jacobs*, for petitioners.

*Nancy M. Gilmore, Harry J. Negro, Bradley C. Plovan, Aaron M. Bailey, Mary Ann Waters*, and *Lee H. Gyomlai*, for respondent.

TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 3

FINDINGS OF FACT .......................................................................... 5

I.   STW transitions from distributor to manufacturer. ....................... 5

II.  STW makes initial contacts with Planning Associates. .................. 6

———————

[1] Cases of the following petitioners are consolidated herewith: Clear Sky Insurance Co., Inc., Docket No. 17169-19; Steven C. Hoover and Sandra L. Medlin, Docket No. 17177-19; Ray Dallago and Mark P. Butzko, Docket No. 17178-19; Richard J. Shor and Theodosia E. Shor, Docket No. 17187-19; Jeffrey D. Chase and Lisa R. Chase, Docket No. 17201-19; Robert C. Maxson and Sherry A. Maxson, Docket No. 17205-19; and Chris Ballew, Docket No. 17206-19.

**Served 03/25/25**

2

[*2] III. STW authorizes Planning Associates to conduct a
    feasibility study. .......................................................................... 8

    A.   Rivelle performs the actuarial analysis and
    recommends premiums. .......................................................... 10

    B.   Allgood prepares the comparative analysis of Rivelle's
    recommended premiums. ......................................................... 15

IV. STW moves forward with the captive insurance program
    but retains traditional commercial insurance coverage. .............. 16

V.   CSI joins the OMNI reinsurance pool. ........................................... 21

VI. CSI begins its short-lived insurance operations. .......................... 24

VII. CSI makes an advance to Shor. ................................................... 24

VIII. STW discontinues the CSI Program. ......................................... 25

IX. CSI reorganizes. ........................................................................ 27

X.   IRS audits STW and CSI, and litigation ensues. .......................... 28

OPINION ....................................................................................... 29

I.   Jurisdiction .............................................................................. 29

II.   Burden of Proof ........................................................................ 30

III. The Taxation of Insurance Companies and Transactions—A
    Primer ..................................................................................... 31

IV. The CSI Program did not constitute insurance for federal
    income tax purposes. ................................................................ 32

    A.   CSI did not distribute risk. ..................................................... 33

        1.   There was a circular flow of funds. ................................. 36

        2.   The policies were not arm's-length contracts. ................. 37

        3.   OMNI did not charge actuarially determined
    premiums. ..................................................................... 38

        4.   Rev. Rul. 2002-89 does not apply. .................................. 40

[*3] B. The CSI Program was not insurance in the commonly accepted sense. ...................................................................... 41

    1. CSI was not operated as an insurance company............ 42

    2. Some of the policies are likely not valid and binding. ................................................................................ 44

    3. Premiums were not reasonable nor the result of an arm's-length transaction. ............................................... 45

V. Payment made by STW to CSI was not an ordinary and necessary business expense. ........................................................ 47

VI. The advance from CSI to Shor was a constructive dividend, not a loan. ..................................................................................... 48

VII. Conclusion................................................................................... 50

## MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, *Judge*: These consolidated cases involve a "microcaptive" insurance arrangement.[2] During 2015 and 2016 the individual petitioners were shareholders of Sani-Tech West, Inc. (STW), a subchapter S corporation with a principal place of business in Camarillo, California. From December 2015 to December 2016, STW participated in a captive insurance program and deducted as an insurance premium the payment made to Clear Sky Insurance Co., Inc. (CSI), a captive insurer incorporated in Montana and owned by STW's executive officers. Electing the alternative (and much more generous) tax regime available to certain small insurance companies under section 831(b), CSI excluded

---

[2] A captive insurance company is a corporation whose stock is owned by a small number of shareholders, and which handles all or a part of the insurance needs of its shareholders or their affiliated entities. *See Caylor Land & Dev., Inc. v. Commissioner*, T.C. Memo. 2021-30, at *8 n.4 (citing *Harper Grp. v. Commissioner*, 96 T.C. 45, 46 n.3 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992)). A "microcaptive" insurer is a captive insurance company that elects the alternative tax structure provided for under section 831(b).

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*4]** from its income the purported insurance premium received. Because the deduction reduced STW's taxable income by the amount paid to CSI, the further exclusion of that amount from CSI's taxable income meant a reduction in their total federal income tax liability.

Concerned that the Internal Revenue Service (IRS) would rebuff its attempt to characterize the amount paid to CSI as payment for insurance because of a lack of risk distribution, CSI sought to achieve risk distribution by pooling its risks with those of other unrelated captive insurers. To that end, CSI attempted to cede to a risk pool, in this case OMNI Insurance Co. (OMNI), a portion of the risk it had assumed from STW. CSI then reinsured its pro rata share of the pooled risk through a quota share retrocession arrangement with OMNI.[3]

When respondent denied the claimed deductions and exclusions from income and determined deficiencies in petitioners' federal income tax for the 2015 and 2016 tax years (tax years at issue), they filed Petitions with this Court, seeking a review of his determinations. The main issues are (1) whether CSI could make a section 831(b) election to exclude the purported insurance premiums from its income and (2) whether STW was entitled to deduct those payments.[4] At their roots,

---

[3] We will refer to the microcaptive insurance arrangement, consisting of (1) the purported insurance arrangement between CSI and STW, (2) the purported reinsurance arrangement between CSI and OMNI, and (3) the quota share retrocession arrangement, collectively as the CSI Program.

[4] Respondent determined accuracy-related penalties under section 6662(a), (b)(6), and (i) for tax years 2015 and 2016. Section 6662(a) and (b)(6) imposes a penalty equal to 20% of any portion of an underpayment of tax required to be shown on a return that is attributable to a "disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law." Section 7701(o) codifies the "economic substance" doctrine, providing for a conjunctive test whereby a transaction is treated as having economic substance only if (1) the transaction changes the taxpayer's economic position in a meaningful way (apart from federal income tax effects) and (2) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into the transaction.

The 20% penalty under section 6662(a) and (b)(6) is increased to 40% when any portion of an underpayment is attributable to a "nondisclosed noneconomic substance transaction." *See* § 6662(i). For this purpose, a "nondisclosed noneconomic substance transaction" means any portion of a transaction described in section 6662(b)(6)—i.e., a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law—with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return nor in a statement attached to the return. § 6662(i)(2).

[*5] both issues turn on whether the CSI Program constitutes "insurance" for federal income tax purposes. We conclude that the CSI Program did not constitute "insurance" for federal income tax purposes because (1) CSI did not achieve risk distribution and (2) the CSI Program did not resemble insurance in the commonly accepted sense.

## FINDINGS OF FACT

Richard Shor founded STW in 1992 and served as its president and chief executive officer until 2020. Sherry Maxson joined STW in 1992 and, like Shor, worked there until 2020. When Shor originally hired Maxson, her duties were primarily to handle the phones, make purchases, and perform other administrative office work. Maxson was "work[ing] the office," and Shor was "work[ing] the field," making direct contact with customers, procuring sales, and completing deliveries. Maxson would eventually assume greater responsibilities at STW, serving as its chief operating officer and vice president of operations during the tax years at issue. Besides Shor and Maxson, no other STW shareholder had an executive role at the company.

I.     *STW transitions from distributor to manufacturer.*

Since its founding, STW has been a distributor of high-purity process components, including tubing, filters, gaskets, stainless steel fittings, and hose assemblies. STW's distribution operation consisted of buying plastic tubing and other parts from manufacturers and reselling them to pharmaceutical and biotech companies for use in their research and production lines.

By the early 2010s the pharmaceutical industry had begun to shift away from reusable "stainless steel capital equipment" to more cost-effective, efficient, and disposable single-use products. Shor and Maxson would propel STW's growth by supplying the demand for single-use products at a time when single-use products were new in the pharmaceutical industry.

---

The Court has yet to decide whether the transactions in a microcaptive case lacked economic substance within the meaning of section 7701(o)(1). Nor has the Court addressed whether a taxpayer "adequately disclosed" a microcaptive transaction. In the recent microcaptive cases where these questions were unavoidable, the Court deferred ruling on the matter to request and duly consider additional briefing on the applicability of section 7701(o). *See Patel v. Commissioner*, T.C. Memo. 2024-34, at *3 n.5; *see also Royalty Mgmt. Ins. Co. v. Commissioner*, T.C. Memo. 2024-87, at *54. We will, therefore, address respondent's penalty determinations in a separate opinion.

**[*6]** In 2012 or 2013 Shor and Maxson established SaniSure, Inc. (SaniSure), a wholly owned subsidiary of STW. SaniSure was to be STW's "manufacturing arm," specializing in single-use components and assemblies, including tubing, filters, clamps, stir bars, and bespoke items designed to customer specifications. SaniSure manufactured some single-use products from scratch using raw materials and assembled others from premade parts.

The creation of SaniSure changed STW's operational focus from distribution to manufacturing, which had a much higher profit margin. Through SaniSure, STW manufactured components primarily for large pharmaceutical companies, including Amgen and Bayer. SaniSure's single-use products were popular with STW's customers because they were pre-sterilized and eliminated the need to sterilize reusable equipment repeatedly. Users could insert SaniSure's pre-sterilized products where needed and discard them after use, saving time and improving production efficiency.

II. *STW makes initial contacts with Planning Associates.*

STW sterilized 80 to 85% of its single-use products before delivering them to customers.[5] But STW did not sterilize its products in house. Instead, it contracted with unaffiliated third parties—often a company called "Sterigenics"—to sterilize its products with gamma radiation.

The Sterigenics facilities were in Ontario and Covina, California, roughly 100 miles from STW's facilities in Camarillo and Oxnard, California. At the start of 2015 STW transported approximately two shipments to Sterigenics per week for sterilization. By 2016 STW was transporting three to four shipments to Sterigenics per week.

After Sterigenics sterilized the products, an STW employee picked them up at Sterigenics and transported them to STW's facilities. Although Sterigenics certified that the products were properly sterilized, STW employees performed quality inspections to ensure that sterility had not been compromised. After inspection, STW employees separated the products for shipment to customers. STW used third-party carriers—typically United Parcel Service—to ship sterilized products to its customers. The products were shipped Free On Board Origin, which meant that STW was off the hook for damage caused while

---

[5] From here on, unless otherwise indicated, references to STW include SaniSure.

[*7] in transit from its facilities to its customers.  But, if a customer received contaminated products, the customer could return them to STW.

STW's customers were generally satisfied with its products, returning less than one percent of the products received.  Maxson attributes the high level of customer satisfaction and low level of product returns to STW's procedures for inspecting products, acknowledging that the procedures worked well.

There were only a few instances where a customer claimed a package from STW was damaged.  Most of the time, the damage was due to mishandling by the customer or the common carrier, not due to a packing issue at STW.  Damage claims from customers were not frequent enough nor monetarily significant enough for STW to seek additional insurance coverage solely for those damages.  And though some of the purchase orders STW received from its customers had stipulations making STW liable for losses incurred because of late delivery, no customer has ever sued STW for losses caused by late delivery of products.  Further, in 2014, STW's liability for late deliveries was limited to the customer's refusal of the orders.

STW, for some time, transported assemblies to and from Sterigenics using a pickup truck.  The assemblies were packed in boxes and secured with stretch wrap.  That worked most of the time.  But, on two occasions in 2014, a box containing sterilized products flew off an STW truck in transit from Sterigenics to an STW facility, destroying its contents.  Because shipments between Sterigenics and STW were works-in-progress, STW, not its customers, bore the burden of a loss of such shipments.  STW had never suffered such a loss before or since.  To avoid delay and replace the lost assemblies, STW incurred higher manufacturing and sterilization costs.

After the incidents, Shor and Maxson spoke with their insurance broker, Eichberg Associates, about filing a claim for the losses suffered.  Eichberg told them that their insurance policy with their then insurer, The Hartford (Hartford), did not cover the first incident but suggested that STW might recover up to the cost of raw materials for the second incident.  Before the incidents, STW had never filed an insurance claim for a lost shipment of work-in-progress.  And in the end, it did not file a claim with Hartford for either incident.  STW solved the problem of boxes falling off its open flatbed trucks by buying a fully enclosed box truck.

[*8]   Despite not filing a claim, Shore and Maxson spoke with a Hartford representative.  They laid out some scenarios for the Hartford representative and sought coverage for potential risks inherent in those scenarios.  The Hartford representative informed them that the risks were "unknown" and that Hartford did not provide the coverage they wanted.  So, they sought coverage elsewhere.

Shore and Maxson sought insurance coverage from Sentry Insurance.  Shore asked Sentry about insuring their "unknown" risks, and Sentry told him it could cover some but not all of the risks.  STW would later replace Hartford with Sentry.  The insurance purchased through Sentry would have covered any losses incurred were STW's products to, once again, fly out of its trucks.

Though Shor considered the products lost in 2014, with a total sale value of roughly $117,000, "small potatoes," he would have the Court believe that similar misfortunes could cost STW its multimillion-dollar customer accounts.  Maxson took a similar position.

Shor and Maxson discussed their purported concerns with STW's attorney, Bob Sternberg, and STW's accountant, Martin Marrietta, who suggested that STW consider captive insurance.  Sternberg and Marrietta introduced Shor to multiple captive insurance managers, including John Capasso, president of Captive Planning Associates (Planning Associates).  In November 2014, Shor met with Capasso to discuss possibly forming a captive insurance company to address his and Maxson's purported concerns.  We do not believe that Shor's and Maxson's purported concerns about STW's "unknown" risks were the motivating reasons for pursuing captive insurance.

III.   *STW authorizes Planning Associates to conduct a feasibility study.*

Planning Associates is a one-stop shop for captive insurance planning; it advises businesses and their owners on captive insurance, forms and manages captive insurance companies for its clients, and manages a risk pool in which the captive insurance companies participate.  At Planning Associates, forming a captive insurance company begins with due diligence, which involves reviewing the prospective client's business, including the business' financial statements and insurance coverages, and preparing a preliminary report on captive insurance.  Planning Associates prepares a preliminary report to, in part, ensure that the prospective client

**[*9]** understands captive insurance. If the prospective client proceeds to the next phase, Planning Associates commissions a feasibility study on the formation of a captive insurance company.

The feasibility study provides prospective clients with premium determinations for potential captive insurance policies and a comparative analysis of those determined premiums with market premiums for traditional commercial insurance policies. After receiving the feasibility study, the prospective client either accepts or declines the formation of a captive insurance company.

For each feasibility study, Planning Associates requests that the client provide several documents, including two to three years of tax returns, financial statements, and insurance policies. But Planning Associates does not conduct the Feasibility Study itself. Instead, Planning Associates hires third-party actuaries to calculate premiums for potential captive insurance policies and an unaffiliated insurance broker to prepare a comparative analysis of those premiums with market premiums for traditional commercial insurance policies.

Consistent with its standard practice, Planning Associates prepared a preliminary report on captive insurance companies (Preliminary Report) for STW. The Preliminary Report covered, among other things, the tax benefits of operating a small captive insurance company that makes the section 831(b) election, explaining that the section 831(b) election limits taxation of the captive's income to its investment income, thereby allowing the captive to accumulate underwriting profits tax free.[6] The Preliminary Report also explained that the section 831(b) election is available only for insurers with annual written premiums not exceeding $1.2 million,[7] adding that the limitation on written premiums "allows the . . . insured(s) the ability to allocate premium levels to be paid in, or not, annually." We find that

---

[6] Underwriting profit is the money left over after an insurer has collected premiums, paid out claims, and covered its operating expenses. It does not include investment income earned on premiums.

[7] For tax years after 2016, Congress raised the premium ceiling from $1.2 million to $2.2 million and added diversification requirements for making a valid section 831(b) election. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 333(a)(1), (b)(1), 129 Stat. 2242, 3106–08 (2015). Because these changes are effective only for tax years beginning after December 31, 2016, they are not relevant for the tax years at issue. *See id.* § 333(c), 129 Stat. at 3108.

[*10] the tax benefits influenced petitioners' ultimate decision to form a microcaptive insurance company.

Besides illuminating the structure, functions, and benefits of captive insurance arrangements, the Preliminary Report recommended 19 lines of coverage and associated policy limits for CSI to offer STW. Planning Associates based its recommendations, in part, on its review of STW's tax returns, and financial statements.[8]  The total premiums charged for the recommended coverage lines were projected to be between $750,000 and $1,150,000, well within the $1.2 million limitation on written premiums.  No underwriting or actuarial analysis was conducted to support the Preliminary Report's recommended coverage lines or projected premiums.

After receiving the Preliminary Report in early September 2015, Shor and Maxson discussed it internally and agreed to explore captive insurance further.  STW would later retain Planning Associates to prepare a feasibility study.  By late October 2015, Planning Associates had prepared a draft feasibility study (First Draft Feasibility Study). The draft included a proposed list of 19 coverage lines for STW to consider buying from CSI and recommended premiums at which CSI would offer coverage.  The listed coverage lines were nearly identical to those suggested in the Preliminary Report.  The only difference was the removal of three coverage lines proposed in the Preliminary Report and the addition of two new ones.  Rivelle Consulting Services (RCS), an actuarial consulting firm, produced the recommended premiums for the 19 coverage lines.

A.  *Rivelle performs the actuarial analysis and recommends premiums.*

At Planning Associates' request, STW engaged RCS to provide actuarial services in connection with its exploration of captive insurance.  Marn Rivelle founded RCS and performed the actuarial analysis (or "ratemaking analysis") for the feasibility study.  His task was to conduct an actuarial review of STW and, based on that review, determine a premium for each proposed line of coverage separately.

Rivelle had no direct communications with STW personnel.  He based his analysis on information gathered by Planning Associates.  As

---

[8] It is unclear whether Planning Associates had copies of STW's then-existing commercial insurance policies before delivering a copy of the Preliminary Report to STW.

[*11] part of its information-gathering effort for the feasibility study, Planning Associates requested several documents from STW, including three years of its tax returns and financial statements, copies of its commercial insurance policies, and its five-year loss history. Planning Associates provided Rivelle STW's tax returns, loss history, and financial statements, but he did not receive STW's complete commercial insurance policies for his analysis. Providing STW's five-year loss history was easy enough: It had none. STW had no relevant claims history for the five years preceding Rivelle's ratemaking analysis.

Rivelle considered several accepted actuarial methods for setting insurance premiums. He ultimately settled on the "frequency times severity" method, an actuarial method insurers use to set premiums that reflect the expected number of claims during a given period (frequency) and the average cost of a claim (severity). At its core, the logic underlying the "frequency times severity" method is rather simple. When an insurer knows the frequency and severity of claims, it can estimate the amount it expects to pay on those claims (that is, the expected losses) and, with some adjustments, price premiums to cover expected losses and operating costs.

Though the underlying logic may be simple, the devil always lies in the details. Rivelle had to estimate how often he would anticipate STW's filing a claim for each line of coverage. Just one problem: STW did not have a significant claims history that would be "reliably predictable on its own." Because Rivelle was unaware of any publicly available benchmark or database, he improvised. He relied on nonpublic frequency estimates he had previously used for about ten other captive insurance companies he felt had risk profiles similar to STW's. Using his nonpublic, proprietary frequency data and professional judgment, he estimated how often STW would file a claim under each line of coverage (in other words, how often STW would experience a loss "event" covered under each line of coverage).

The next step for Rivelle was to determine the severity of a claim under each proposed line of coverage. For that, Rivelle focused on the "probable maximum loss." The "probable maximum loss" under a coverage line is the covered loss STW would suffer in a likely "worst-case scenario." He capped the "probable maximum loss" for each coverage line at its policy limit. He reasoned that the loss resulting from a likely worst-case scenario would "very likely" exceed the policy limit, but because CSI is only on the hook to pay for covered losses up to the policy limit, the probable maximum loss cannot exceed the policy limit.

[*12] With his frequency and severity variables on hand, Rivelle calculated the expected loss under each line of coverage for a one-year policy period spanning 2015 and 2016. To these expected loss estimates, he added a premium enhancement (namely, a "contingency margin") to protect CSI in case actual losses suffered exceeded expected losses. He selected a 100% contingency margin (actuarial jargon for he doubled the expected losses) based, in part, on his review of some actuarial literature on homeowners catastrophe insurance and the findings of a then five-year-old report produced for the Delaware Insurance Department in which he examined the appropriate contingency margin for roughly 30 to 35 captive insurers.

To complete his ratemaking analysis, Rivelle had one last thing to consider. Like other insurance companies, a captive insurer has operating costs and must price premiums to cover its bills. Rivelle estimated that CSI's total operating costs would be $75,000, which he apportioned pro rata between the proposed lines of coverage based on the expected losses. Thus, the recommended premium for each coverage line was the postenhancement expected loss (again, this is just the expected loss doubled) plus the pro rata share of operating costs.

Rivelle prepared two sets of recommendations. Incorporated into the First Draft Feasibility Study, his initial set of recommended premiums for the 19 proposed lines of coverage were as follows:

| Coverage | Severity/ Policy Limit | Expected Loss | Recommended Premium |
|---|---|---|---|
| Accounts Receivable | $500,000 | $22,222 | $47,991 |
| Administrative Action | 1,000,000 | 54,054 | 116,735 |
| Business Interruption | 1,000,000 | 26,667 | 57,589 |
| Catastrophe Excess | 1,000,000 | 23,529 | 50,814 |
| Cost of Re-work | 1,000,000 | 31,746 | 68,559 |
| Cyber Liability | 1,000,000 | 7,273 | 15,706 |
| Deductible Reimbursement | 1,000,000 | 8,000 | 17,277 |
| Defective Materials or Workmanship | 1,000,000 | 31,746 | 68,559 |
| Pollution Liability | 500,000 | 6,000 | 12.958 |
| Financial Reporting E&O | 1,000,000 | 12,000 | 25,915 |
| Intellectual Property Infringement | 1,000,000 | 14,999 | 32,392 |
| Employee Replacement | 1,000,000 | 13,333 | 28,795 |

| | | | |
|---|---|---|---|
| **[*13]** Legal Expense Reimbursement | 1,000,000 | 30,303 | 65,442 |
| Mechanical & Electric Breakdown | 1,000,000 | 22,222 | 47,991 |
| Product Liability | 1,000,000 | 15,000 | 32,394 |
| Reputational Risk | 1,000,000 | 70,028 | 151,232 |
| Supply Chain Interruption | 1,000,000 | 36,364 | 78,531 |
| Transit Risk | 1,000,000 | 33,333 | 71,987 |
| Directors & Officers | 1,000,000 | 11,111 | 23,996 |
| **Total** | | **$469,930** | **$1,014,863** |

After Rivelle prepared his initial recommended premiums for the First Draft Feasibility Study, Capasso shared the draft with Shor and Maxson in late October 2015. A few days later Capasso met with Shor and Maxson to discuss the draft. During the meeting, Shor and Maxson raised concerns about some of the proposed coverage lines.

To address their concerns, in early November 2015, Capasso arranged a conference call with Kevin Allgood, a senior vice president at HUB International. Rivelle was not present. Roughly a week later, Capasso emailed Rivelle, attaching a document with comments on his actuarial analysis. Most comments blessed Rivelle's recommended premiums with a terse "ok." But a couple urged that his premiums were "too high." Commenting on Rivelle's pricing of the Administrative Action coverage, Capasso wrote: "[P]remium seems too high—they are not regulated by the FDA and no ee's (PEO)." And on Rivelle's recommended premium for the Transit Risk coverage, he wrote: "[P]remium too high—most shipments are covered by customer—they still have some internal transit risk." Capasso also instructed Rivelle to remove some lines of coverage and add others.

Rivelle made the changes, eliminating Product Liability coverage and adding five new lines of coverage. And though there were no changes to the policy limits for any line of coverage and the 100% contingency margin and $75,000 estimated operating costs remained the same, Rivelle revised some of his prior recommendations, suggesting that he adjusted the frequency variable for some lines of coverage. In particular, Rivelle decreased his recommended premium for the Administrative Action coverage from $116,735 to $42,882 and the Mechanical & Electrical Breakdown coverage from $47,991 to $23,823. But he made no significant changes to his recommended premium for the Transit Risk coverage.

[*14] After the changes and revisions, Rivelle priced 22 proposed lines of coverage, and the recommended premiums increased from $1,014,863 in the First Draft Feasibility Study to $1,116,107 in the Second Draft Feasibility Study:

| Coverage | Frequency | Severity/Policy Limit | Expected Loss[9] | Recommended Premium |
|---|---|---|---|---|
| Accounts Receivable | 23 years | $500,000 | $22,222 | $47,646 |
| Administrative Action | 50 years | 1,000,000 | 20,000 | 42,882 |
| Advertising Liability | 63 years | 1,000,000 | 16,000 | 34,305 |
| Audit Risk | 60 years | 1,000,000 | 16,667 | 35,735 |
| Business Interruption | 38 years | 1,000,000 | 26,667 | 57,175 |
| Catastrophe Excess | 43 years | 1,000,000 | 23,529 | 50,449 |
| Cost of Re-work | 32 years | 1,000,000 | 31,746 | 68,066 |
| Cyber Liability | 138 years | 1,000,000 | 7,273 | 15,593 |
| Deductible Reimbursement | 125 years | 1,000,000 | 8,000 | 17,153 |
| Pollution Liability | 83 years | 500,000 | 6,000 | 12,865 |
| Financial Reporting E&O | 333 years | 1,000,000 | 3,000 | 6,432 |
| Impaired Or Damaged Goods | 28 years | 1,000,000 | 36,364 | 77,966 |
| Intellectual Property Infringement | 67 years | 1,000,000 | 14,999 | 32,160 |
| Inventory in Custody of Others | 80 years | 1,000,000 | 12,500 | 26,801 |
| Employee Replacement | 75 years | 1,000,000 | 13,333 | 28,588 |

---

[9] To calculate the expected loss under each line of coverage using the "frequency times severity" method, Rivelle multiplied the respective frequency and severity variables for each line of coverage. For example, because Rivelle estimated that STW would suffer a loss covered by the Administrative Action coverage once every 50 years, he anticipated it would file a claim under that line of coverage 1/50 times during the one-year coverage period. He then multiplied 1/50 by $1,000,000 (the probable maximum loss covered under the Administrative Action coverage) to calculate the expected loss under the Administrative Action coverage ($20,000).

We take this opportunity to note that some of Rivelle's expected loss calculations are slightly off. For example, the expected loss under the Catastrophe Excess coverage should be $23,256 (1/43 multiplied by $1,000,000), not $23,529.

| | | | | |
|---|---|---|---|---|
| [*15] Legal Expense Reimbursement | 33 years | 1,000,000 | 30,303 | 64,972 |
| Loss of Distributorship | 14 years | 1,000,000 | 70,004 | 150,093 |
| Mechanical & Electric Breakdown | 90 years | 1,000,000 | 11,111 | 23,823 |
| Reputational Risk | 14 years | 1,000,000 | 70,028 | 150,145 |
| Supply Chain Interruption | 28 years | 1,000,000 | 36,364 | 77,966 |
| Transit Risk | 30 years | 1,000,000 | 33,333 | 71,469 |
| Directors & Officers | 90 years | 1,000,000 | 11,111 | 23,823 |
| **Total** | | | **$520,554** | **$1,116,107** |

Planning Associates incorporated the revised premiums into an updated draft feasibility study (Second Draft Feasibility Study). The Second Draft Feasibility Study does not explain Rivelle's reasons for revising his initial recommendations.

B. *Allgood prepares the comparative analysis of Rivelle's recommended premiums.*

Planning Associates hired Allgood to "market test" Rivelle's revised premiums. He was to prepare a comparative analysis of Rivelle's recommended premium for each proposed coverage line with prevailing market premiums for similar coverage in traditional commercial insurance markets, hopefully identifying the most cost-effective option.

Between late September and November 2015, Capasso exchanged emails with Allgood about the comparative premium analysis. He provided Allgood with a chart summarizing Rivelle's ratemaking analysis in mid-November. Two days later, Allgood emailed Capasso a draft of his analysis (HUB Market Analysis). Five days after that, he emailed him the final version, consisting of a chart showing actuarial premiums, as determined by Rivelle, and market premiums and deductibles, as determined by Allgood, accompanied by Allgood's comments.

In the HUB Market Analysis, Allgood sought to determine the prevailing minimum market premium for each of the 23 proposed coverage lines. Unsurprisingly, he could not provide market premiums for coverage that was not readily available in traditional commercial insurance markets. For these nontraditional coverage lines (9 out of

[*16] the 23), he set the minimum "market" premium equal to Rivelle's recommended premium and almost invariably commented, "Non-Standard Coverage; Unable to Price." Allgood did not question whether Rivelle's recommended premiums for these "non-standard" coverage lines were actuarially valid; he accepted them at face value and did not perform an actuarial or underwriting study of his own.

Despite accepting Rivelle's recommended premiums as the minimum "market" premium for several "non-standard" coverage lines (namely those he was unable to price), Allgood provided a guesstimate of market premiums for a few "non-standard" coverage lines. Though these coverage lines (5 out of the 23) were also "non-standard," they were not absent in traditional commercial insurance markets. But his guesstimates usually came with qualifications. Commenting on the accuracy of one of his guesstimates, Allgood cautioned that "much more underwriting data [were] need[ed] to confirm."

Allgood did not obtain insurance quotes for any of the proposed lines of coverage, including those readily available in traditional insurance markets. But not for lack of trying. He requested that STW submit insurance applications to commercial insurers for quotes, yet STW completed no applications. Without quotes, Allgood relied on his professional experience and conversations with other HUB employees to gauge the prevailing market premiums. His estimated market premiums totaled $1,086,037, slightly less than Rivelle's total recommended premium of roughly $1.1 million.

IV.    *STW moves forward with the captive insurance program but retains traditional commercial insurance coverage.*

In late November 2015 Planning Associates provided STW with a final version of the feasibility study and an annotated copy of Allgood's "market test" analysis. The feasibility study incorporated Rivelle's revised actuarial analysis and recommended that STW establish a stand-alone, pure captive insurance company. The recommendation was based partly on the thought that a captive insurer would allow STW "to segregate and establish reserves independent of the operating company."

The feasibility study also discussed the federal income tax treatment of captive insurers. It recommended that STW establish a microcaptive taxable only on its investment income under section 831(b). It explained that "[f]or a captive insurance arrangement to be

[*17] valid, it must engage in the spreading of risks among many insureds, what is known as 'risk distribution.'"

The feasibility study claimed that, under Rev. Rul. 2002-89, 2002-2 C.B. 984, "if the Captive derives at least 50% of its premiums (not risk) from unrelated third-party insureds, then risk distribution has been met." It recommended that CSI participate in a "risk pool facility" to fall within the safe harbor, noting that Planning Associates commonly uses "the pooling services" offered by OMNI, a risk pool owned by one of Planning Associates' affiliates.

Yet, though Planning Associates recommended establishing CSI as a stand-alone, pure microcaptive insurance company, it advised STW not to ditch traditional commercial insurers. Instead, it recommended retaining coverage from traditional commercial insurers and using a captive to supplement rather than immediately replace them. Foretelling a continuing role for traditional commercial insurance in STW's risk management toolkit, Planning Associates touted captive insurance as providing STW an "opportunity to develop [a] surplus, which can be used to fund additional commercial coverage in the future." STW took the advice and retained commercial insurance coverage from traditional insurers like Hartford, though later replaced Hartford with Sentry, another traditional commercial insurer.

The Hartford policies, consisting of a Commercial General Liability policy, a Commercial Package policy, and an Excess Liability policy, had a one-year coverage period (January 14, 2015 to 2016). STW paid $61,571 in premiums for the Commercial General Liability policy, which included coverage for Bodily Injury and Property Damage, Personal and Advertising Injury, Medical Payments, and an endorsement covering Employee Benefits Injury. The Commercial Package policy cost $21,435 in premiums and provided coverage for, among other things, Business Personal Property, Automobile, and Expediting Expenses.[10] The Excess Liability policy cost $14,398 in premiums and, in effect, increased the policy limits on three primary policies written with Hartford (namely, General Liability, Products Liability, and Automobile Liability).

STW allowed the insurance policies purchased from Hartford to expire without renewal on January 14, 2016. From the expiration date

---

[10] The auto insurance premium was subject to adjustment during the year because of changes in the cars covered.

**[\*18]** to January 14, 2017, it changed its commercial insurance carrier to Sentry.  STW purchased five lines of coverage from Sentry: Commercial Property Coverage, Crime and Fidelity Coverage, Commercial Auto Coverage, Commercial Excess/Umbrella Coverage, and Commercial General Liability Coverage, which covered Bodily Injury and Property Damage, Personal and Advertising Injury Liability, Medical Payments, and Employee Benefits Liability.

The Commercial Property Coverage from Sentry was subject to a blanket coverage limit of $6.5 million.  The Commercial General Liability Coverage was subject to a General Aggregate Limit of $6 million (other than Products Completed Operations), a Products Completed Operations Aggregate Limit of $4 million, a Personal and Advertising Injury Limit of $2 million, and occurrence limits of up to $2 million.  The initial total estimated premium for the coverage Sentry provided was $67,626.  Overall, the policies purchased from Sentry covered more risk exposures and were cheaper than the Hartford policies.

But Shor and Maxson wanted to supplement their traditional commercial insurance coverage.  On December 8, 2015, Shor gave Planning Associates the green light to form a captive insurance company.  That same day, Shor signed a Captive Application Certificate of Authority for submission to the State of Montana on behalf of CSI, listing him and Maxson as CSI's directors.  Several days later, Planning Associates filed Articles of Incorporation for CSI, which the Montana Commissioner of Securities & Insurance approved shortly thereafter.

The feasibility study recommended forming the captive in Montana partly because Montana law imposes "no investment restrictions on pure Captives, except if such investment(s) threatens the solvency or liquidity of the Captive."  Planning Associates prepared an Investment Policy Statement to formalize CSI's process for investing its capital, surplus, and reserves.  The Investment Policy Statement, among other things, placed limits on how much of CSI's assets may be invested in fixed-income debt obligations, providing that "[t]he exposure of the Captive assets to any one (1) obligation, other than securities of the U.S. government, shall not exceed ten percent (10%) of the market value of the Captive assets."  As Secretary of the Investment Committee created to oversee CSI's investments, Shor would later sign and approve the Investment Policy Statement in late December.

**[\*19]** The day before Shor approved the Investment Policy Statement, CSI entered into a stock purchase agreement with Shor and Maxson to meet Montana's minimum $250,000 capital requirement for a pure captive. Shor agreed to purchase 80% of CSI's stock for $200,000, and Maxson agreed to purchase the remaining 20% for $50,000. They both borrowed the funds for the capital contribution from STW.

Around this time, Planning Associates prepared a Strategic Business Plan for CSI, identifying the 23 proposed lines of coverage as the primary policies to be underwritten by CSI and setting premiums (totaling $1,116,107) based on Rivelle's revised actuarial analysis. As CSI's debut grew nearer, Planning Associates' personnel emailed Shor and Maxson about the next steps, but Shore had last-minute doubts about STW's paying over $1 million for captive insurance. The following conversation ensued via email on December 22, 2015:[11]

- At 11:06 AM, Moira Cava, Planning Associates' accountant, sent an email to Shor and Maxson explaining the necessary steps to begin CSI's insurance operation and the flow of funds between STW, CSI, and OMNI: STW would transfer $1,116,107 in premiums to CSI; CSI would then transfer $562,870 to OMNI; and OMNI would transfer $476,495 back to CSI the first week of January 2016.

- At 11:48 AM, Shor responded to Cava, asking her who OMNI was and why it was retaining funds. He further stated that regarding the amount he wished STW to pay for the CSI policies, "[w]e are closer to $800K that we can fund with."

- At 11:56 AM, Capasso wrote back to Shor, reminding him that OMNI is the reinsurance pool. Capasso also assured Shor that he would look "at eliminating a few coverages to get closer to the $800k in premiums."

- At 11:59 AM, Shor responded to Capasso, asking whether Capasso had been able to get "comps on ALL of the coverages."

- At 12:07 PM, Debra Gaglioti, Planning Associates' chief operating officer, responded to Shor, offering to eliminate six lines of coverage to bring the total premium down to $813,256. She

---

[11] Emails from Shor bear time stamps in Pacific Standard Time, and emails from Moira Cava, Debra Gaglioti, and Capasso bear time stamps in Eastern Standard Time. All time stamps have been converted to Eastern Standard Time for clarity.

**[\*20]** eliminated coverage for Accounts Receivable, Advertising Liability, Audit Risk, Financial Reporting E&O, Employee Replacement, and Reputational Risk.

- At 12:08 PM, Capasso responded to Shor's 11:59 AM email, saying he had provided the "revised worksheet to everyone a couple of weeks ago."

- At 12:44 PM, Shor responded to Gaglioti's 12:07 PM email. He approved her proposed changes, agreed to proceed with $813,256 as the total premium, and asked for a new breakdown of the flow of funds between STW, CSI, and OMNI.

- At 12:47 PM, Gaglioti responded to Shor and informed him that Planning Associates could send revised instructions "tomorrow morning."

- At 12:48 PM, Shor responded to Gaglioti, saying: "We are sending you the $250,000 [capital contribution] today."

- At 1:35 PM, Gaglioti confirmed the changes and sent an attachment showing the removed lines of coverage and their associated premiums.

About a week later, STW paid CSI $813,256 in premiums. CSI provided STW with two insurance policies: General Liability[12] and Directors & Officers Liability. Both policies were dated December 31, 2015, and were effective from that date. The General Liability policy includes 15 different coverages, and the Directors & Officers policy covers a single type of professional liability exposure (thus a total of 16 different coverages). Each line of coverage is subject to an individual limit, which for all but one of the 16 lines of coverage is $1 million; for Pollution Liability coverage, the individual limit is $500,000. The two policies are subject to a shared liability limit of $1.5 million. The policies had a one-year coverage period (December 31, 2015 to 2016) and were priced as follows:

---

[12] The General Liability policy includes lines of coverage that could be better described as "property" coverage. Consequently, the "general liability" nomenclature used by CSI does not resemble the types of coverage included in a commercial general liability policy. Of the 15 lines of coverage in the General Liability policy, 9 cover STW's property and 6 cover STW's liability exposures.

**[*21]**

| Policy Type | Coverage | Premium |
|---|---|---|
| General Liability | Administrative Action | $789,433 |
| | Business Interruption | |
| | Catastrophe Excess | |
| | Cost of Re-work | |
| | Cyber Liability | |
| | Deductible Reimbursement | |
| | Pollution Liability | |
| | Impaired or Damaged Goods | |
| | Intellectual Property Infringement | |
| | Inventory in Custody of Others | |
| | Legal Expense Reimbursement | |
| | Loss of Distributorship | |
| | Mechanical & Electrical Breakdown | |
| | Supply Chain Interruption | |
| | Transit Risk | |
| Directors & Officers Liability | | 23,823 |
| **Total** | | **$813,256** |

On December 31, 2015, a few days after STW paid CSI the premiums, the Montana Commissioner of Securities & Insurance issued a Certificate of Authority to CSI, granting it permission to do business as a pure captive insurance company. That same day, Planning Associates drafted CSI's Accounting and Financial Policies and Procedures (Financial Operations Manual), outlining, among other things, CSI's policy on issuing loans and advances. Effective December 31, 2015, the Financial Operations Manual prohibited the issuance of a loan or advance during CSI's first year of operation, explicitly providing that "[t]he Company may not issue a loan in its first year of operation."

V.    *CSI joins the OMNI reinsurance pool.*

OMNI managed a risk pool for participating captives. On December 31, 2015, OMNI, CSI, and STW entered into the OMNI Insurance Company Risk Pool Participation Agreement. From December 31, 2015 through 2016, OMNI had 31 participating captives, including CSI. OMNI's participating captives wrote insurance policies directly to businesses in exchange for premiums.

**[\*22]** The participating captives cede to OMNI a portion of the risk insured through their direct written policies and, as consideration, pay OMNI a reinsurance premium equal to about 51% of the premiums received from insured businesses.[13]  Each participating captive then insures a portion of the total risk ceded to OMNI on a pro rata basis, calculated by dividing the premiums the captive paid to OMNI by the total premiums OMNI received from all participating captives.  OMNI pays each captive a retrocession premium for taking on a pro-rata share of the pooled risk.

For each coverage OMNI reinsured, the participating captive acted as the primary or fronting insurer.  OMNI would only be required to pay the "Reinsurance Layer" of any claim, that is, the amount of the claim exceeding a specified minimum percentage of the primary policy limit.  To cover the "Reinsurance Layer" of a claim (for which the pool was liable), each participating captive kept 12.5% of the reinsurance premium paid to OMNI in the OMNI Retrocession Trust (OMNI Trust), a trust account managed by OMNI.

If the OMNI Trust has insufficient funds to pay the pool's liabilities, OMNI's only recourse is to make a cash call on its participants for additional funds.  Should a participating captive not comply with the cash call, OMNI could sue the captive or report it to the appropriate regulators of the domicile in which the captive is licensed.  Regulators could threaten to place the captive in receivership and take control of its assets.

As a participant in the OMNI reinsurance pool, CSI ceded to OMNI a portion of the risk it had assumed from STW and, on December 31, 2015, paid OMNI a reinsurance premium of $409,693, an amount equal to 50.38% of the total premiums CSI charged STW.  Consistent with the overall scheme, CSI then insured a pro-rata share of pooled risk in exchange for a retrocession premium equal to the reinsurance premium it had just paid, less a $52,000 deposit into the OMNI Trust

---

[13] Reinsurance is an agreement between an initial insurer (the ceding company) and a second insurer (the reinsurer), under which the ceding company passes to the reinsurer some or all of the risks that the ceding company assumes through the direct underwriting of insurance policies.  Generally, the ceding company and the reinsurer share profits from the reinsured policies, and the reinsurer agrees to reimburse the ceding company for some of the claims that the ceding company pays on those policies.

*Trans City Life Ins. Co. v. Commissioner*, 106 T.C. 274, 278 (1996).

[*23] and required fees of $7,875 to OMNI and $7,500 to Planning Associates. OMNI paid the retrocession premium to CSI on January 4, 2016, four days after CSI paid OMNI the reinsurance premium. And although $52,000 was placed in the OMNI Trust to pay CSI's share of claims against the risk pool, CSI controlled the investment of those funds and was entitled to reclaim any unused funds.

The OMNI Reinsurance Agreement, which governed the reinsurance of CSI's risk through the OMNI risk pool, specified the reinsurance layer of each coverage offered by CSI and reinsured by OMNI in percentage terms:

| Coverage | Reinsurance Layer | Reinsurance Premium |
|---|---|---|
| Administrative Action | between 15% and 100% | $28,345 |
| Business Interruption | between 25% and 100% | 25,843 |
| Catastrophe Excess | between 37.5% and 100% | 16,043 |
| Cost of Re-work | between 50% and 100% | 15,043 |
| Cyber Liability | between 20% and 100% | 8,280 |
| Deductible Reimbursement | between 15% and 100% | 11,338 |
| Pollution Liability | between 15% and 100% | 8,504 |
| Impaired or Damaged Goods | between 20% and 100% | 41,400 |
| Intellectual Property Infringement | between 10% and 100% | 25,053 |
| Inventory in Custody of Others | between 25% and 100% | 12,114 |
| Legal Expense Reimbursement | between 15% and 100% | 42,946 |
| Loss of Distributorship | between 20% and 100% | 79,699 |
| Mechanical & Electric Breakdown | between 10% and 100% | 18,558 |
| Supply Chain Interruption | between 25% and 100% | 35,241 |
| Transit Risk | between 37.5% and 100% | 22,728 |
| Directors & Officers | between 10% and 100% | 18,558 |
| **Total** | | **$409,693** |

The reinsurance layers were set based on a study prepared by Rivelle in 2014 (OMNI Actuarial Study). Because participating captives in the OMNI Pool issued different policies with different policy limits, the OMNI Actuarial Study was Rivelle's attempt to identify and recommend the appropriate percentage splits between the "primary" and reinsurance layers based on the underlying policy limits. Rivelle's

[*24] analysis relied on a nonpublic, proprietary database of liability claims for insurable risks against California school districts; he did not provide the data in the OMNI Actuarial Study or any other document. Rivelle looked at 20,869 claims and stratified them based on the amount of the claims to determine how many claims would fall below a certain policy limit.

In calculating the reinsurance premiums, Rivelle used a contingency margin of 1.5 to allocate expected losses and premiums between the "primary" and reinsurance layers, which has the effect of decreasing the expected losses covered by the reinsurance layer while increasing the premiums allocated to that layer. The OMNI Actuarial Study did not explain Rivelle's choice of contingency margin.

VI.     *CSI begins its short-lived insurance operations.*

At all relevant times, Shor and Maxson owned CSI. But they did not directly manage its operations. Instead, they hired Planning Associates to provide captive management services for CSI. Planning Associates' responsibilities as manager included performing quarterly reviews, arranging board meetings, carrying out "general maintenance," and preparing and filing tax returns.

The CSI policies purchased by STW were claims-made policies; CSI only had to pay claims made during the coverage period (December 31, 2015 to 2016) and for 15 business days thereafter. STW made no claims against any CSI policy during the coverage period. But, in 2016, CSI received a cash call from OMNI, notifying CSI that OMNI had approved a $150,000 reinsurance claim to be paid by the OMNI Trust and that CSI was responsible for paying $4,674.64 of the pooled claim. Planning Associates directed CSI to make the payment.

VII.     *CSI makes an advance to Shor.*

During the tax years at issue STW's headquarters and principal place of business was on Flynn Road in Camarillo, California (Flynn Property). But as STW transitioned into manufacturing, it needed a larger "clean room" to house its rapidly growing orders. It planned to lease a building close to the Flynn Property to house the larger clean room. STW found a suitable building and leased warehouse space on Calle Suerte in Camarillo (Calle Suerte Property).

In 2016 Shor created Dosia, LLC (Dosia), a wholly owned company, to facilitate the purchase of the Calle Suerte Property. The

[*25] total project cost was $4,820,000: $4 million to purchase the property, $809,542.50 in construction and remodeling costs, and $10,457.50 in professional fees. Dosia applied for and received a Small Business Administration (SBA) loan to purchase the Calle Suerte Property. The SBA loan totaled $1,928,000 (or 40% of the project's total cost), while $2,410,000 came from a loan from Citizens Business Bank.

The SBA loan required Dosia to contribute 10% of the total project cost, or $482,000. Shor did not borrow the funds from STW because STW had been having cashflow problems and issuing a loan would have "strapped the company." So Shor asked Capasso about borrowing the $400,000 from CSI. Shor requested the loan despite Capasso's advising him that regulators generally do not authorize captives to issue loans within the first two years of operation.

At Shor's request, Capasso contacted the Montana Captive Insurance Examiner to see whether Montana would approve the loan. The Montana Captive Insurance Examiner advised Planning Associates that "the loan should not exceed the amount of . . . earned surplus" and that the loan must have "a specific stated maturity date."

On August 11, 2016, CSI's board of directors consented to a proposal to lend Shor $400,000 at 1.5% interest; the loan was an unsecured personal loan and was to be used to purchase the Calle Suerte Property. The Montana Commissioner of Securities approved the $400,000 loan to Shor on August 12, 2016. Shor issued a promissory note to CSI a few days later for the $400,000 loan. The note had no payment terms except that the unpaid principal balance plus interest was due on August 15, 2017. Shor contributed the loan proceeds to Dosia and, through Dosia, bought the Calle Suerte Property for $4 million. STW continued to lease warehouse space at the Calle Suerte Property, paying its rent to Shor through Dosia.

Shor paid off the loan in 2020 after he had sold STW and was "flush with cash." He did not make any payments on the loan before 2020 because it slipped his mind, and CSI did not demand repayment. As president of CSI, Shor was responsible for demanding repayment from himself on CSI's behalf.

VIII. *STW discontinues the CSI Program.*

On November 14, 2016, Planning Associates contacted Shor and Maxson about renewing the captive insurance policies for the following year. A week later, Shor informed Planning Associates that STW would

**[*26]** not renew the policies with CSI and would allow CSI to become dormant.

It is odd for STW to terminate the captive insurance arrangement after only one year of coverage; the feasibility study advised that "captive participation must be perceived as no less than a five (5) to ten (10) year commitment." At trial, Shor testified that the decision not to renew the CSI policies was based on a reassessment of STW's liability-related concerns. He claimed that he and Maxson realized that some of STW's "unknown" risks were manageable without a captive insurer.

This realization supposedly occurred because of an incident involving Amgen and a third-party supplier. Amgen and the supplier had executed a substantial supply contract, so when the supplier's products failed sterility testing, Shor assumed Amgen would take adverse action against the supplier. But Amgen did not. Instead, Amgen worked with the supplier to resolve the issue, and the supplier continued to provide Amgen with products.

Shor testified that he considered Amgen's response "eye-opening." So he discussed the Amgen incident with Bayer, one of STW's large pharmaceutical customers. The discussion with Bayer ostensibly proved productive. STW and Bayer executed a supply agreement which provided that Bayer would install personnel in STW's facility if problems arose.

Shor testified that on the basis of the experience with Bayer, he concluded that STW's customers viewed their relationship with STW as more of a "partner[ship]" than merely a "supplier and consumer" relationship and that the relationship was "more important than" any "single incident." He testified that if STW produced defective products, its customers would work with it to address the issue rather than take punitive action, thereby diminishing the need to purchase captive insurance from CSI.

We do not find Shor's testimony about their motivating reason for declining to renew the CSI policies credible. First, it is unclear how Amgen's cooperation (or the cooperation of any of STW's customers) vitiates the need for Catastrophe Excess coverage, Pollution Liability coverage, Intellectual Property Infringement coverage, Transit Risk coverage, or Mechanical & Electrical Breakdown coverage, just to name a few. The Catastrophe Excess coverage, for example, covers losses incurred due to "[d]amages from natural disasters such as earthquakes,

[*27] floods, tornados and hurricanes." Surely, continued coverage for losses caused by natural disasters remains valuable even after securing the understanding and cooperation of STW's largest customers.

Second, during 2016, Shor and Maxson were entertaining offers from potential buyers seeking to acquire STW. The offer calculations were based on multiples of STW's EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization). Shor believed STW was worth more than the offers made because he knew its EBITDA was low partly because of the captive insurance expense.

So Shor sought to "get more profits back into the business" and "drive up [its] EBITDA" by cutting costs, including insurance costs. Shor understood that eliminating the captive insurance expense would increase STW's EBITDA, thereby increasing its sale price. STW was eventually sold to a private equity firm in 2020. We believe the most plausible explanation for STW's terminating the captive insurance arrangement was not a reassessment of its insurance needs but Shor's and Maxson's desire to maximize its sale price.

IX.    *CSI reorganizes.*

On July 3, 2017, Shor and Maxson adopted a Plan of Complete Liquidation and Dissolution of CSI. A few months later, CSI notified the Montana Commissioner of Securities and Insurance of its intent to dissolve.

On October 26, 2017, CSI filed Articles of Dissolution for Profit Corporation with the State of Montana. The following day, the Montana Commissioner of Securities & Insurance issued a letter verifying CSI's dissolution and confirming that it had terminated CSI's Certificate of Authority.

On October 30, 2017, OMNI and CSI executed a Form of Separation Agreement to the OMNI Retrocession Trust, terminating their relationship. They also executed a Withdrawal Notice directing the OMNI Retrocession Trust to pay CSI $47,325.36, the remaining amount of its deposit in the OMNI Trust.

Shor and Maxson had a change of heart at some point about liquidating CSI. So on November 21, 2017, CSI filed Articles of Revocation of Voluntary Dissolution with the State of Montana. That same day, the Montana secretary of state promptly issued a Certification Letter certifying that CSI filed its Articles of Revocation of

[*28] Voluntary Dissolution with an effective date of November 21, 2017.

A week later, CSI filed Articles of Amendment for Captive Insurance Corporation with the Montana secretary of state, changing its type of business from Captive Insurance Company to General for Profit Corporation. The Montana secretary of state issued a Certification Letter that CSI filed Articles of Amendment changing its name to Clear Sky Holdings, Inc., a domestic profit corporation. To date, Clear Sky Holdings, Inc., continues to exist as a Montana corporation. The premiums and capitalization paid to CSI are still held by Clear Sky Holdings, Inc.

X. *IRS audits STW and CSI, and litigation ensues.*

For the 2015 tax year, STW claimed $813,256 in deductions for amounts paid to CSI, deducting them as insurance premiums that were ordinary and necessary business expenses. The individual petitioners reported flowthrough income and deductions from STW on their 2015 income tax returns. Respondent examined STW's 2015 tax return and disallowed the deductions, determining that the payments STW made to CSI were not for insurance and were not ordinary and necessary business expenses.

CSI reported the amounts paid by STW on its Form 1120–PC, U.S. Property and Casualty Insurance Company Income Tax Return, for tax years 2015 and 2016. It treated $31,279 of the amounts paid by STW as earned premiums for 2015 and $781,977 as earned for 2016. CSI excluded those amounts from taxable income on its Form 1120–PC for tax years 2015 and 2016 under section 831(b). Respondent disallowed CSI's claimed exclusion on the ground that it was not an insurance company, and therefore, its income was not excludable premium income.

CSI disclosed the captive insurance transaction by filing Form 8886, Reportable Transaction Disclosure Statement, with its 2016 Form 1120–PC. None of the individual petitioners disclosed the captive insurance transaction on their income tax returns.

In Notices of Deficiency dated June 26, 2019, respondent determined the following deficiencies in petitioners' federal income tax:

[*29]

| Petitioner | Tax Year | Deficiency |
|---|---|---|
| Genie R. Jones | 2015 | $1,812 |
| Clear Sky Insurance Company, Inc. | 2015 | 4,692 |
| | 2016 | 265,924 |
| Steven C. Hoover & Sandra L. Medlin | 2015 | 1,133 |
| Ray Dallago & Mark Butzko | 2015 | 11,238 |
| Richard J. Shor & Theodosia E. Shor | 2015 | 257,560 |
| | 2016 | 168,458 |
| Jeffrey D. Chase & Lisa R. Chase | 2015 | 3,867 |
| Robert C. Maxson & Sherry A. Maxson | 2015 | 82,285 |
| Chris Ballew | 2015 | 3,798 |

CSI and the individual petitioners filed timely Petitions with this Court, seeking judicial review of respondent's determinations.[14]

OPINION

I.  *Jurisdiction*

When a Notice of Deficiency issued to an S corporation shareholder includes adjustments to S corporation items and other items unrelated to the S corporation,[15] we have jurisdiction to determine the correctness of all adjustments in the shareholder-level deficiency proceeding. *See Johnson v. Commissioner*, 160 T.C. 18, 28 (2023) (citing *Winter v. Commissioner*, 135 T.C. 238, 245–46 (2010)). We, therefore, have jurisdiction to redetermine the correctness of respondent's

___

[14] The individual petitioners resided in the following cities and states when they filed their respective Petitions: Genie R. Jones resided in Edmond, Oklahoma; Steven C. Hoover and Sandra L. Medlin resided in Sarasota, Florida; Ray Dallago and Mark Butzko resided in Las Vegas, Nevada; Richard J. Shor and Theodosia E. Shor resided in Moorpark, California; Jeffrey D. Chase and Lisa R. Chase resided in Greenwood, Indiana; Robert C. Maxson and Sherry A. Maxson resided in Eloy, Arizona; and Chris Ballew resided in Thousand Oaks, California.

[15] An S corporation is governed under the rules in subchapter S of chapter 1 of subtitle A of the Code; S corporations are not generally subject to federal income tax but, like partnerships, are conduits through which income flows to their shareholders. *See* § 1366; *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001) ("Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation.").

**[*30]** adjustments to petitioners' flowthrough shares of STW's income and any other determinations in the Notice of Deficiency.

II.    *Burden of Proof*

Generally, we presume that the Commissioner's determinations in a Notice of Deficiency are correct, and the taxpayer bears the burden of proving that the determinations are incorrect. *See* Rule 142(a)(1); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Rockwell v. Commissioner*, 512 F.2d 882, 885–87 (9th Cir. 1975), *aff'g* T.C. Memo. 1972-133. The taxpayer also bears the burden of proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Consequently, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

Under section 7491(a), if a taxpayer provides credible evidence concerning a factual issue relevant to ascertaining the taxpayer's tax liability and complies with certain other requirements, the burden of proof shifts to the Commissioner on the factual issue.[16]

The resolution of the issues presented in these cases does not turn on which party has the burden of proof.[17] Ordinarily, when each party has satisfied its burden of production, the party supported by the weight of the evidence will prevail; thus, a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. We do not perceive an evidentiary tie in these cases and can resolve the issues on the preponderance of the evidence. *See id.*; *Schank v. Commissioner*, T.C. Memo. 2015-235, at *16.

---

[16] Section 7491 is relevant only as to factual issues; it is irrelevant as to legal issues. *See Nis Fam. Tr. v. Commissioner*, 115 T.C. 523, 538 (2000).

[17] Petitioners assert that the burden of proof shifts to respondent under section 7491(a). Respondent retorts that petitioners have failed to meet the substantiation requirement of section 7491(a) and, therefore, failed to shift the burden of proof. Because we can decide these cases on the preponderance of the evidence and need not rely on who bears the burden of proof to resolve any of the issues presented here, we do not address whether section 7491(a) shifts the burden of proof to respondent.

[*31] III.     *The Taxation of Insurance Companies and Transactions—A Primer*

Businesses manage risk in several ways.  *See* 1 Daniel W. Gerber et al., *New Appleman on Insurance Law Library Edition* § 1.01[3] (2021) (enumerating common methods used to manage risk).  A business may, for example, manage its risks through self-insurance.  Self-insurance is "a risk management method whereby a person or entity calculates a sum of money to be set aside periodically in a reserve [fund] for possible future use as a payment for a potential future loss."  *Id.*  In effect, a business that manages risk through self-insurance assumes the risk of loss and saves for rainy days to cover the loss should it materialize.

Rather than assume the risk of loss, a business may manage its risk by transferring it to someone else for consideration through an insurance contract.  Ordinarily, under such contracts, the insured makes a payment or a series of periodic payments, and, in exchange, the insurer assumes a portion or all of the insured's risk by compensating the insured for covered losses.  *See* Christopher C. French & John F. Dobbyn, *Insurance Law in a Nutshell* 2 (6th ed. 2021).

Importantly, these methods of managing risk have disparate tax consequences.  Amounts set aside in a loss reserve fund as a form of self-insurance are not deductible.  *See Harper Grp.*, 96 T.C. at 46.  But amounts paid for insurance (usually called an insurance premium) are deductible under section 162(a) as ordinary and necessary expenses when paid or incurred in connection with a trade or business.  Treas. Reg. § 1.162-1(a).  Thus, the distinguishing line between self-insurance schemes and insurance arrangements is important.  This line becomes blurred when the insured and the insurer are related, as is ordinarily the case with captive insurers.[18]  In those cases a purported payment for insurance to an affiliated company may resemble self-insurance, raising doubts about its deductibility.

Further complications arise when the captive insurer is a so-called "microcaptive."  Although the Code permits the insured to deduct insurance premiums paid as ordinary and necessary trade or business expenses, it also requires the insurer to include premiums received in taxable income.   Insurance companies—other than life insurance

---

[18] A captive insurer is a licensed insurance company formed to insure the risks of its parent corporation and affiliates.  *See* Constance A. Anastopoulo, *Taking No Prisoners: Captive Insurance as an Alternative to Traditional or Commercial Insurance*, 8 Ohio St. Entrepren. Bus. L.J. 209, 213 (2013).

**[\*32]** companies—are generally subject to the same tax structure as other corporations and, therefore, include premium income in taxable income. *See* §§ 11, 831(a). But, certain small insurance companies, including "microcaptive" insurers, may elect an alternative tax structure. *See* § 831(b). Specifically, for the tax years at issue an insurance company that makes a valid election under section 831(b) and has annual written premiums of $1.2 million or less is subject to tax only on its investment income, excluding its premium income from taxation. *See* § 831(b)(1) and (2).

To make a valid section 831(b) election, a captive entity must be an "insurance company." *See* § 831(b)(2)(A). For this purpose, an insurance company is a "company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies." §§ 831(c), 816(a). Because CSI did not transact in annuities, it must transact in insurance to make a valid section 831(b) election. *See Syzygy Ins. Co. v. Commissioner*, T.C. Memo. 2019-34, at \*28. Also, as discussed above, the deductibility of insurance premiums as ordinary and necessary trade or business expenses depends on whether the payments "were truly payments for insurance." *Id.* Thus, the resolution of the central issues presented here—whether CSI could make a section 831(b) election to exclude the purported insurance premiums from its income and whether STW was entitled to deduct those payments from its income—hinges on whether the arrangements under consideration constituted insurance for federal income tax purposes.

IV.    *The CSI Program did not constitute insurance for federal income tax purposes.*[19]

Neither the Code nor the Treasury regulations define insurance; we are, therefore, guided chiefly by caselaw in determining whether an arrangement constitutes insurance for federal income tax purposes.

---

[19] As the Supreme Court recently articulated in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), overruling *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "instead of declaring a particular party's reading [of a statute] 'permissible' . . . , courts [must] determine the best reading of the statute and resolve [any] ambiguity." However, the Supreme Court cautioned that by overruling *Chevron* it did not "call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [the Supreme Court's] change in interpretive methodology." *Loper Bright*, 144 S. Ct. at 2273.

[*33] *R.V.I. Guar. Co. & Subs. v. Commissioner*, 145 T.C. 209, 224–25 (2015). We have historically and consistently considered four nonexclusive factors. Under the nonexclusive four-factor insurance test, an arrangement constitutes insurance for federal income tax purposes only if (1) the arrangement involves an insurable risk of loss; (2) the arrangement shifts the risk of loss from the insured to the insurer; (3) the insurer distributes the risk of loss among its policyholders; and (4) the arrangement is insurance in the commonly accepted sense. *See Harper Grp.*, 96 T.C. at 58. Failure to satisfy all four factors is fatal to characterizing an arrangement as insurance for federal income tax purposes. *See AMERCO & Subs. v. Commissioner*, 96 T.C. 18, 38 (1991) (noting that the four factors are not independent or exclusive but establish a framework for determining "the existence of insurance for Federal tax purposes"), *aff'd sub nom. AMERCO, Inc. v. Commissioner*, 979 F.2d 162 (9th Cir. 1992).

The CSI Program did not satisfy all four factors. Specifically, we conclude that the CSI Program did not constitute insurance for federal income tax purposes because CSI did not distribute the risk of loss among its policyholders, and the CSI Program was not insurance in the commonly accepted sense.[20]

A. *CSI did not distribute risk.*

Insurance serves a different function for the insured and the insurer. By paying a predetermined amount (i.e., a premium) into a general fund from which payment will be made for an economic loss covered under the insurance policy, insureds obtain protection from covered economic loss, externalizing their risk of loss by shifting that risk to the insurer, who manages the fund and assumes the liability to pay the proceeds on any covered loss. *See* French & Dobbyn, *supra*, at 1–6. So, from an insured's perspective, insurance is a risk-shifting device. *R.V.I.*, 145 T.C. at 225.

But from the insurer's perspective, insurance is a risk-distribution device; it is a mechanism by which the insurer pools

---

[20] Respondent argues that the CSI Program did not constitute insurance for federal income tax purposes because, among other things, the risks involved were not insurable, and STW did not shift those risks to CSI. Because we find that CSI failed to adequately distribute risk among its policyholders and that the CSI Program was not insurance in the commonly accepted sense, we need not—and do not—reach the issue of whether the risks STW sought to insure against were insurable risks nor whether STW shifted those risks to CSI.

**[\*34]** numerous risks of multiple insureds to reap the benefits of the "law of large numbers." *Id.* at 228. One of the primary responsibilities of an insurer is fixing premiums that will cover its costs, including its liability to pay the proceeds on covered losses. *See* French & Dobbyn, *supra*, at 6. To reliably fix premiums, an insurer must accurately forecast how much it is likely to pay on covered losses; that is, the insurer must accurately estimate the covered losses its insureds will incur.

By distributing numerous risks across a sufficiently large number of insureds, an insurer can use the "law of large numbers" to accurately predict the frequency and amount of the covered losses. The "law of large numbers" posits that "the average of a large number of independent losses will be close to the expected loss." *Avrahami v. Commissioner*, 149 T.C. 144, 181 (2017). So "[b]y assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums." *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1, 24 (2014) (quoting *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987), *aff'g* 84 T.C. 948 (1985)). The smoothing of losses to match the receipt of premiums "allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as a premium." *Securitas Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 2014-225, at \*25 (quoting *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1300). In essence, by entering into insurance contracts with a large group of similarly situated insureds and "writing policies for enough independent risks, an insurer can predict 'the frequency and amount of loss within this larger group . . . [and] set the premium at a level that will cover the losses, cover the insurer's overhead and expenses, and earn a profit.'" *Rsrv. Mech. Corp. v. Commissioner*, 34 F.4th 881, 905 (10th Cir. 2022) (quoting 1 Daniel W. Gerber et al., *supra*, § 1.01), *aff'g* T.C. Memo. 2018-86. But the insurer's predictive powers depend on reaping the benefits of the "law of large numbers."

To reap the benefits of the "law of large numbers," risk distribution is critical. Generally, risk distribution occurs when the insurer pools a sufficiently large collection of independent risks. *See Rent-A-Center*, 142 T.C. at 24. Risks are independent when "the likelihood of a loss under one policy is independent of the likelihood of a loss under a separate policy." *Rsrv. Mech. Corp. v. Commissioner*, 34 F.4th at 904 (citing *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1300). In other words, independent risks "are generally unaffected

**[\*35]** by the same event or circumstance." *Rent-A-Center*, 142 T.C. at 24 (citing *Humana Inc. v. Commissioner*, 881 F.2d 247, 257 (6th Cir. 1989), *aff'g in part, rev'g in part* 88 T.C. 197 (1987)).

Here, we must analyze whether there was risk distribution from the perspective of CSI, the purported microcaptive insurer, because "it is the insurer's risk, not the insured's, that is reduced by risk distribution." *Swift v. Commissioner*, T.C. Memo. 2024-13, at \*28. When analyzing whether an insurer achieved risk distribution, we have cautioned against a simple tally of the entities it insured; instead, we have emphasized the insurer's total number of independent risk exposures. *See Avrahami*, 149 T.C. at 182–83. The inquiry is whether the insurer had insured against sufficiently numerous, diverse, and independent risks to enable the "law of large numbers" to operate. *See id.* at 183.

In prior captive insurance cases, taxpayers have argued, to varying success, that the captive insurer achieved risk distribution by insuring against sufficiently numerous, diverse, and independent risk exposures through (1) direct policies to brother-and-sister entities with a large enough pool of unrelated risks or (2) participation in an insurance pool, whereby the pool performs the functions of an insurance company. *See id.* at 181–82; *Rent-A-Center*, 142 T.C. at 24; *Harper Grp.*, 96 T.C. at 52. Petitioners argue that CSI distributed its risk by participating in the OMNI Reinsurance Pool.[21] We disagree. Because

---

[21] Petitioners did not argue in their briefs that CSI achieved risk distribution through its direct written policies. We, therefore, deem the argument to have been waived or conceded. *See Estate of Atkinson v. Commissioner*, 115 T.C. 26, 35 (2000) (deeming an issue not addressed in posttrial brief to have been waived or conceded), *aff'd*, 309 F.3d 1290 (11th Cir. 2002); *see also Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

In any event, CSI did not achieve risk distribution through its direct written policies. CSI issued two direct written policies to two insureds (STW and its wholly owned subsidiary, SaniSure), providing 16 lines of coverage and insuring 1 location, 2 vehicles, and 50 employees. The bottom line is that CSI did not insure against sufficiently numerous, diverse, and independent risks to enable the "law of large numbers" to operate. Our caselaw demonstrates how large these independent risk exposures must be, and CSI fell short. *See R.V.I.*, 145 T.C. at 214 (finding that the insurer issued 951 policies covering 714 different insured parties with 754,532 passenger vehicles, 2,097 real estate properties, and 1,387,281 commercial-equipment assets); *Rent-A-Center*, 142 T.C. at 2 (finding that, over time, the captive insured 14,300 to 19,740 employees, 7,143 to 8,027 vehicles, and 2,623 to 3,081 stores); *Harper Grp.*, 96 T.C. at 51 (finding that the captive insured 7,500 customers covering more than 30,000 different shipments and 6,722 policies).

**[\*36]** the OMNI Reinsurance Pool did not perform the functions of a bona fide insurance company, CSI did not—and, indeed, could not— insure against sufficiently numerous, diverse, and independent risk exposures through participation in the OMNI Reinsurance Pool. *See Swift*, T.C. Memo. 2024-13, at \*36 (holding that the microcaptive insurers did not achieve risk distribution through participation in reinsurance pools because the pools did not perform the functions of a bona fide insurance company).

In determining whether an entity such as a reinsurance pool performs the functions of a bona fide insurance company, we have considered a laundry list of factors, including:

- whether it was created for legitimate nontax reasons;

- whether there was a circular flow of funds;

- whether the entity faced actual and insurable risk;

- whether the policies were arm's-length contracts;

- whether the entity charged actuarially determined premiums;

- whether comparable coverage was more expensive or even available;

- whether it was subject to regulatory control and met minimum statutory requirements;

- whether it was adequately capitalized; and

- whether it paid claims from a separately maintained account.

*Avrahami*, 149 T.C. at 185. If the OMNI Reinsurance Pool did not perform the functions of a bona fide insurance company, then the policies it issued to CSI and other participants in the reinsurance pool were not insurance policies, and CSI, therefore, did not—and could not— distribute risk by reinsuring those policies. *See id.* at 190. Several factors lead us to conclude that the OMNI Reinsurance Pool did not perform the functions of a bona fide insurance company.

1.      *There was a circular flow of funds.*

Each participating captive in the OMNI Reinsurance Pool wrote insurance policies directly to businesses for which their respective

**[*37]** insureds paid premiums. Each participating captive ceded to OMNI a portion of the risk it had insured through the direct written policies. As consideration, each participating captive paid approximately 51% of the premiums it charged its insureds to OMNI as reinsurance premiums. Each participating captive also placed a percentage of the reinsurance premium it paid to OMNI into the OMNI Retrocession Trust. OMNI was to use the funds in the OMNI Trust to pay claims associated with the risk participating captives ceded to it.

After ceding a portion of its risk to OMNI, each participating captive then insured a portion of the total risk ceded to OMNI on a pro rata basis, calculated by dividing the premiums the captive paid to OMNI by the total premiums all participating captives paid to OMNI. In exchange for assuming a pro-rata share of the pooled risk, OMNI paid a retrocession premium to each participating captive.

As a participating captive, CSI ceded a portion of the risk it had assumed from STW to OMNI. CSI paid OMNI a reinsurance premium of $409,693, approximately 50.38% of the premiums STW paid to CSI. CSI then insured a pro rata share of the total risk participating captives ceded to OMNI. In exchange for CSI's taking on its pro rata share of the pooled risk, OMNI paid to CSI a retrocession premium equal to the $409,693 reinsurance premium CSI had paid just four days before, less a $52,000 deposit into the OMNI Trust and required fees of $7,500 to Planning Associates and $7,875 to OMNI. Although the exchange of payments was "not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds." *Id.* at 186.

2. *The policies were not arm's-length contracts.*

Recall how the OMNI Reinsurance Pool worked. If STW made a claim under its policies with CSI, CSI would be responsible for paying the claim (both the "primary" and reinsurance layers). If any of those claims reached the reinsurance layer, CSI could have presented the "excess" claim to OMNI for reimbursement under the reinsurance agreement. The chance that OMNI would not be able to reimburse a covered loss under the OMNI Reinsurance Agreement raises questions about whether a reasonable business would enter into such a contract absent tax motivations. *See id.* at 188; *Swift,* T.C. Memo. 2024-13, at *34.

OMNI, remember, passed on the vast majority of its premiums to the participating captives as retrocession premiums. Because only

[*38] 12.5% of premiums were placed in the OMNI Trust, demands for additional capital are easily contemplated should OMNI experiences losses. But these capital calls might fall upon the participating captives at a tough time, and those captives that had invested in illiquid assets might have difficulty meeting the calls. Simply put, OMNI "would be required to go hat in hand to the participating captives to cover cash shortfalls, despite [its] inability to force any of the participating captives to pay more money into the pool to cover the claim." *See Swift*, T.C. Memo. 2024-13, at *34. This could cause cascading problems across OMNI, resulting in unpaid claims or financial stress for captives and insureds in the arrangement.

3.       *OMNI did not charge actuarially determined premiums.*

Because neither the Code nor the regulations define "actuarially determined" premiums in the context of captive insurance, we have relied on caselaw for guidance. *See Syzygy*, T.C. Memo. 2019-34, at *34. In prior microcaptive cases, we have considered a few factors, including whether all participants in the reinsurance pool pay the same percentage of direct written premiums to the reinsurance entity and whether the reinsurance entity's loss ratios deviated significantly from the industry standard.[22] *See, e.g.*, *Swift*, T.C. Memo. 2024-13, at *35–36.

Both factors suggest that OMNI did not charge actuarially determined reinsurance premiums. First, OMNI charged its pool members roughly 51% of their direct written premiums. "As in our prior cases, we are concerned with a one-size-fits-all approach to pricing." *Patel*, T.C. Memo. 2024-34, at *41. There is no apparent reason for allocating roughly 51% of each captive's premiums to the reinsurance layer and 49% to the "primary" layer other than to attempt to come within a perceived IRS safe harbor.

In a typical captive arrangement involving reinsurance, one would expect participating captives to pay individually and actuarially determined premiums based on each captive's expected losses. A one-size-fits-all approach to allocating premiums between layers of reinsurance, like the one used here, suggests that the allocation was not actuarially determined. *See Avrahami*, 149 T.C. at 186 (finding a one-size-fits-all approach to risk pool premium pricing objectionable); *see*

---

[22] The loss ratio generally represents the percentage of each premium dollar an insurer spends on claims. So, for example, a loss ratio of 60% means that 60 cents of each premium dollar earned is used to pay claims and associated expenses.

**[\*39]** *also Swift*, T.C. Memo. 2024-13, at \*35–36 ("Charging a uniform reinsurance premium percentage to all captives participating in the pool based on general lines of coverage and amount of underlying premium plainly fails to account for the specific risks presented by each of the agreements being reinsured through the pools.").

We also suspect that the reinsurance premium OMNI received was not commensurate with the risks it assumed. Around 51% of CSI's premiums from STW were assigned to the reinsurance layer (which CSI handed over to OMNI as reinsurance premium) and 49% to the "primary" layer (which CSI retained). But, as respondent's expert Mark Crawshaw explains, Rivelle's use of a 1.5 contingency margin to allocate expected losses and premiums between the OMNI Pool and CSI resulted in only 34% of expected losses being assigned to the OMNI Pool. Though the pricing was designed to meet Planning Associates' objective of transferring roughly 51% of STW's premiums to the OMNI Pool, the use of a 1.5 contingency margin combined with the selected policy limits resulted in less than 50% of expected losses falling in the reinsurance layer. In short, OMNI's premiums were not commensurate with the risks it assumed.

Second, OMNI's loss ratios suggest that the reinsurance premiums OMNI charged were excessive by actuarial standards. For the years 2011 through 2016, the OMNI Pool received $63,345,830 of reinsurance premiums and paid a single claim of $150,000. That results in a loss ratio of roughly 0.2%. OMNI's financial performance does not remotely resemble that of the U.S. reinsurance industry as a whole. For the 2015 and 2016 policy year, OMNI had an average loss ratio of 0.69%. The reinsurance industry's average loss ratio during the same period is approximately 99 times OMNI's, suggesting that OMNI's reinsurance premiums were not commensurate with the risks it assumed.[23]

---

[23] In his expert report petitioners' expert Robert J. Walling III argued that the actuarial soundness of premiums "is based on a prospective assessment of future costs, rather than a retrospective test of actual claims experience . . . . In other words, the appropriate test is 'was there a reasonable expectation for claims activity?', not whether a claim actually happened." He added: "If a California earthquake or Florida hurricane insurance policy does not pay any claims in a given year, that in and of itself does not provide any indication of the actuarial soundness of the policy's premiums." We understand his argument to be an attack on the use of retroactively determined metrics such as loss ratios to evaluate the actuarial soundness of premiums. But, because petitioners did not take up this argument in their briefs, we deem the argument to have been waived or conceded. *See Estate of Atkinson*, 115 T.C. at 35

**[\*40]**        4.        *Rev. Rul. 2002-89 does not apply.*

Petitioners argue that CSI achieved risk distribution because it earned more than 50% of its premiums from unrelated entities through the OMNI Reinsurance Pool, thereby falling within a "safe-harbor" provided under Rev. Rul. 2002-89. We have previously held that the Commissioner is required to follow his revenue rulings, and we have treated revenue rulings as concessions by the Commissioner where those rulings are relevant to the disposition of a case. *See Rauenhorst v. Commissioner*, 119 T.C. 157, 171–73 (2002). But for us to treat a revenue ruling as a concession by the Commissioner, the facts of the taxpayer's transaction must be substantially the same as those in the revenue ruling. *See Barnes Grp., Inc. v. Commissioner*, T.C. Memo. 2013-109, at \*37–38, *aff'd*, 593 F. App'x 7 (2d Cir. 2014). We find that the facts here are not substantially the same as those in Rev. Rul. 2002-89 and, therefore, decline to apply it.

First, by its terms, Rev. Rul. 2002-89 is applicable only if "[i]n all respects, the parties conduct themselves consistently with the standards applicable to an insurance arrangement between unrelated parties." Rev. Rul. 2002-89, 2002-2 C.B. at 984. As we discuss below, CSI was not operated consistently with the standards applicable to an insurance arrangement between unrelated parties. No one performed any underwriting analysis when crafting the CSI policies. Also, CSI had an unusual financing arrangement with Shor. Without requesting collateral or even a loan application, CSI made a $400,000 advance to Shor. The captive in Rev. Rul. 2002-89 explicitly did not lend any funds to the insured. *Id.* Though CSI did not make the advance to STW directly, petitioners agree that it was used to support STW's business operations. Thus, for purposes of assessing whether Rev. Rul. 2002-89

---

(deeming an issue not addressed in posttrial brief to have been waived or conceded); *see also Mendes*, 121 T.C. at 312–13 ("If an argument is not pursued on brief, we may conclude that it has been abandoned."). In any case, we reject Walling's argument. Though the absence of claims in any given year may not provide an indication of the actuarial soundness of the determined premiums, a history of such absence does. From 2011 through 2016, the OMNI Pool received $63,345,830 of reinsurance premiums and paid a single claim of $150,000, resulting in a loss ratio of roughly 0.2%. We think that suggests the parties did not have a "reasonable expectation for claims activity" even though OMNI paid a single claim in 2016.

**[\*41]** applies, we see no meaningful difference between an advance to STW directly and an advance to Shor for the benefit of STW.[24]

Second, in Rev. Rul. 2002-89 the amounts paid by the insured to the captive were "established according to customary industry rating formulas." *Id.* As we discuss below, the premiums STW paid to CSI are extraordinarily high when compared to premiums set by standard industry formulas.

Third, petitioners' understanding of the "safe harbor" in Rev. Rul. 2002-89 is incomplete. In addition to earning more than 50% of its total premiums (on a gross and net basis) from unrelated third parties during the tax year, the captive insurer in Rev. Rul. 2002-89 underwrote sufficient risks of unrelated parties. The liability coverage provided by the captive insurer to the unrelated parties accounted for more than 50% of the total risk borne by the captive insurer. *See* Rev. Rul. 2002-89, 2002-2 C.B. at 984. So, for the "safe harbor" to apply, it is not enough for CSI to have earned more than 50% of its total premiums (on a gross and net basis) from unrelated third parties. The liability coverage CSI provided to unrelated parties must account for more than 50% of the total risk CSI bore during the tax year (and by implication the coverage provided to STW must account for less than 50% of the risk borne). Petitioners failed to establish that less than 50% of the risk borne by CSI stems from the liability coverage provided to STW.

> B. *The CSI Program was not insurance in the commonly accepted sense.*

CSI's failure to achieve risk distribution is sufficient grounds for concluding that the CSI Program did not constitute insurance for federal income tax purposes. *See AMERCO*, 96 T.C. at 40 (holding that risk distribution is "necessary to the existence of insurance"). In line with our prior microcaptive cases, we also address the issue of whether the CSI Program constituted insurance in the commonly accepted sense. *See, e.g.*, *Avrahami*, 149 T.C. at 191; *Swift*, T.C. Memo. 2024-13, at \*37.

In determining whether the CSI Program constituted insurance in the commonly accepted sense, we consider several factors, including whether (1) CSI was organized, operated, and regulated as an insurance

---

[24] *See infra* Part VI for the characterization of the advance for federal tax purposes. Regardless of whether the advance is a loan or a constructive dividend, the transfer of funds between CSI and Shor significantly distinguishes the facts of Rev. Rul. 2002-89 and the facts of these cases.

[*42] company; (2) CSI was adequately capitalized; (3) the policies CSI issued were valid and binding; (4) the premiums CSI charged were reasonable and the result of an arm's-length transaction; and (5) CSI paid claims. *See Avrahami*, 149 T.C. at 191.

We begin with some low-hanging fruit: CSI was adequately capitalized and paid proceeds on a claim. We have consistently held that an insurer is adequately capitalized if it meets the domicile jurisdiction's minimum capital requirements. *See, e.g., id.* at 193; *Caylor Land*, T.C. Memo. 2021-30, at *43; *Syzygy*, T.C. Memo. 2019-34, at *41; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *53. CSI satisfied Montana's minimum $250,000 capitalization requirement; it was, therefore, adequately capitalized. *See Avrahami*, 149 T.C. at 193. Further, CSI paid its share of a claim it had insured as a participant in the OMNI Reinsurance Pool.

But even though CSI met Montana's capitalization requirement and paid one claim during its brief spell as a captive insurer, several factors compel us to conclude that the CSI Program did not constitute insurance in the commonly accepted sense.

1. *CSI was not operated as an insurance company.*

CSI's foray into the insurance business was short lived, lasting only a year. But even during its brief stint as a captive insurer, it did not operate as an insurance company normally would. To determine whether CSI operated as an insurance company, we must "look beyond the formalities and consider the realities of the purported insurance transactions." *Hosp. Corp. of Am. v. Commissioner*, T.C. Memo. 1997-482, 74 T.C.M. (CCH) 1020, 1037. In prior microcaptive cases, we have considered whether policies were underwritten per standard insurance practices, whether proper due diligence was undertaken to manage the arrangement, the breadth and depth of knowledge possessed by those overseeing the arrangement, and whether there were any unusual financing arrangements between the captive insurer and related parties. *See, e.g., Keating v. Commissioner*, T.C. Memo. 2024-2, at *26–27; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *50–53. These considerations lead us to conclude that CSI did not operate like an insurance company.

First, no one performed any underwriting analysis when crafting the CSI policies. Rivelle did not conduct an underwriting analysis nor consult with any underwriters. But as respondent's expert Mr. Caldwell explained, insurance companies typically conduct underwriting

**[\*43]** analyses when issuing policies. Through the underwriting process, they determine the terms and scope of coverage they offer, including policy limits, deductibles, and premiums. True enough, Rivelle prepared an actuarial analysis (flawed as it may be). But though actuaries have a role in the underwriting process, an actuarial analysis is not the same as an underwriting analysis; they serve different functions.

As Mr. Caldwell explained, underwriting is a collaborative effort between an insurance company's actuarial and underwriting departments. In simple terms, actuaries use published rates and large datasets for particular risks to define the rating scheme, that is, determine the premium that should be charged for applicants that fit into a given bucket (think risk profile) while adjusting for policy limits, deductibles, prior loss experience, etc. Underwriters decide which bucket (or risk profile) an insurance applicant fits into; they determine whether an applicant is insurable and on what terms. The underwriter relies on information disclosed by the prospective insured on insurance applications issued by the insurance company. The application form includes questions the insurance company deems necessary to properly underwrite the risk (for example, questions about the applicant's loss history).

STW did not submit an insurance application with CSI. Yet, CSI's General Liability policy references "the Application," defined as "your written application for insurance, on a form that we provide, which is deemed to be a part of this Policy." That said, CSI allowed an actuarial report to serve as an application; the General Liability policy provided that the term "application" included "the actuarial report prepared on your behalf by a third-party actuarial firm and any materials submitted and statements made in connection with that Application." But as Mr. Caldwell explained, this is unusual; "it is fair to say that no commercial insurance company would ever underwrite and quote . . . coverages for a company like STW without the benefit of an underwriting application." Without a completed insurance application, Rivelle lacked sufficient information from STW to support the underwriting process. Further, given that the Business Interruption coverage and the Catastrophe Excess coverage covered losses from earthquakes and floods, there should have been extensive documentation or evaluation of seismic or flooding exposure as part of the underwriting process. Yet, there is no evidence of Rivelle (or anyone for that matter) inspecting the site to assess seismic or flooding exposure

**[*44]** or even considering flood or seismic maps that might be relevant to a coastal location in Southern California.

Second, CSI had an unusual financing arrangement with Shor. CSI made a $400,000 advance to Shor without requesting a loan application. As respondent's expert David T. Russell explained, it is not commercially reasonable for an insurance company to lend significant sums of money (representing over 40% of its investment portfolio in 2016) without any evaluation of the borrower's creditworthiness. Further, CSI did not demand that Shor offer collateral, which is not commercially defensible for a loan of this size. The interest rate offered to Shor was well below the Prime Rate and other secured mortgage rates at the time of the loan, even though Shor offered no collateral to secure the obligation. When Shor did not repay as agreed, CSI extended the maturity date by one year to suit Shor's needs. When that did not work, it simply did not attempt to collect on the debt for several years, in violation of its Financial Operations Manual, which required that any loan be repaid within one year.

2. *Some of the policies are likely not valid and binding.*

In line with industry conventions the CSI policies contained elements typically found in commercial insurance policies. The policies include (1) declarations describing the insured parties, period of coverage, policy limits, and policy premium; (2) insuring agreements laying out the insurer's commitment to provide coverage in exchange for premiums and adhere to the conditions laid out in the contract; (3) definitions clarifying the meaning of the terms used in the contract; (4) conditions specifying the requirements the insured must satisfy to receive indemnity payments and, if included, legal defense; and (5) exclusions and limitations describing uncovered events and losses and placing other limits on indemnity payments.

That said, some essential elements of the policies were missing. Respondent's expert Dr. Crawshaw noted that the absence of commercial policy riders left the scope of several lines of coverage undetermined. CSI defined many of the covered (and uncovered) losses by referencing "Commercial Policy." For example, the Catastrophe Excess coverage covered "[d]amages from natural disasters such as earthquakes, floods, tornados and hurricanes, as well as against man-made disasters such as terrorist attacks, in excess of any coverages that any other Insurance Company provides to [STW] pursuant to a Commercial Policy." Similarly, the Deductible Reimbursement/DIC

**[*45]** General coverage covered "[t]he Deductible of any insurance claim that [STW] paid that is not covered by [its] Commercial Policy(s) without other conditions relating to the underlying loss, or, if applicable, a Difference in Condition to [its] Commercial Policy without other conditions to the underlying loss."[25] The only definition for "Commercial Policy" in the insuring agreements stated: "Commercial Policy means a Commercial Policy specifically referenced in the Commercial Policy Rider." Yet the Commercial Policy Rider was nowhere to be found in the policy documents, leaving the scope of coverage unspecified.

Along the same lines, the Supply Chain Interruption coverage covered certain losses incurred because of supply chain disruptions associated with "Events" that occurred at the premises of STW's "Key Suppliers." The "Key Suppliers" are defined as "those suppliers set forth in [STW's] Application or provided to [CSI] in a separate attachment or communication." But no document in the record identified the "Key Suppliers," rendering the coverage unspecified.

In prior cases we held that an insurance policy was valid and binding if, among other things, it "specified what was covered by the policy." *Securitas Holdings*, T.C. Memo. 2014-225, at *28. References to nonexistent documents and commercial policy riders are more than shoddy draftsmanship. Because of these oversights, it is unclear what the policies covered. We, therefore, think it reasonable to conclude that some of the CSI policies were likely not binding.

3. *Premiums were not reasonable nor the result of an arm's-length transaction.*

We find that CSI's premiums were neither reasonable nor the result of an arm's-length transaction. First, as respondent's expert Dr. Crawshaw pointed out, the lines of coverage CSI offered STW overlapped; that is, more than one line of coverage might apply to a single event. For example, the Administrative Actions, Pollution Liability, Cyber Liability, and Intellectual Property Infringement coverage all covered legal expenses, overlapping with the Legal Expense

---

[25] "Deductible" was defined as "the amount payable by [STW] for each claim for Loss under the Commercial Policy and the aggregate or maximum deductible amount payable by [STW] during the term of such Commercial Policy, if applicable and as set forth on the Commercial Policy Rider." "Difference in Condition" was defined as "a loss not covered under by [STW's] Commercial Policy in an amount not to exceed the Limit of Liability less any reimbursements associated with [STW's] Deductible, if applicable and as set forth on the Commercial Policy Rider."

**[\*46]** Reimbursement coverage. Dr. Crawshaw explained that overlapping coverage should be a significant consideration in the actuarial pricing of a policy. So, for example, the price for the Legal Expense Reimbursement coverage should depend on the other available lines of coverage that cover legal expenses. When coverage overlaps, the premium for the combined coverage should be less than the sum of premiums for the individual lines of coverages. Yet, there is no evidence that Rivelle considered the effect of overlapping coverage. Indeed, Rivelle priced each line of coverage on a stand-alone basis, without considering interactions with other lines of coverage.

Second, rate-on-line calculations show that STW paid CSI extraordinarily high premiums for the captive coverages. A higher rate-on-line means that insurance coverage is more expensive per dollar of coverage and could therefore lead to a greater deduction for premiums. *See Syzygy*, T.C. Memo. 2019-34, at \*31. Respondent's expert Dr. Russell calculated that STW spent over 81 cents for every dollar of policy limit per occurrence and 54 cents for every dollar of policy limit in the aggregate on captive insurance. But STW's commercial insurance with Hartford had a rate-on-line of 1.3 cents for every dollar of policy limit per occurrence and 1.1 cents for every dollar of policy limit in the aggregate.

The captive coverage was, therefore, between 48 and 63 times as expensive as the insurance STW purchased from Hartford. This extraordinary difference in cost might be justified if the captive coverages could be expected to generate significantly more claims. Yet, STW submitted no claims to CSI during the coverage period, despite a range of 16 different policy coverages. There is no credible evidence in the record that these charges were justified by a substantial loss history from STW. The difference in cost is especially striking because the CSI policies provided "excess" coverage, which should be less expensive than "primary" coverage. *See id.* at \*31–32.

Third, the CSI policies had terms that deviated significantly from commercial industry standard. Notably, the policies allowed little time for STW to give notice or submit claims that occurred near the end of the policy period. CSI's General Liability policy, for example, covered STW only for claims arising during the policy period and reported to CSI no later than 15 business days after the end of the policy period. But, as Dr. Russell explained, commercial insurance policies normally allow the policyholder to submit claims for 60 days after the policy period ends to give the policyholder time to give notice or file a claim for occurrences

[*47] that happen late in the policy period. Further, the CSI policies did not provide for any refund upon cancellation; the policy documents stated that premiums are "fully earned by [CSI] upon payment." As Dr. Russell points out, this is very rare in commercial insurance policies. Though these terms may not be entirely absent in commercial insurance policies, we find that the limited window for submitting claims and the preclusion of refunds upon cancellation were very unfavorable to STW and inured to the benefit of CSI, suggesting that the parties did not negotiate the policies at arm's length. *See id.* at *32.

Fourth, we find it a bit concerning that Rivelle revised his recommended premiums for some of the proposed lines of coverage on account of Capasso's objections. Rivelle seemingly decreased his recommended premium for the Administrative Action coverage from $116,735 to $42,882 because of Capasso's comment that the premium seemed too high. As a general matter, we have serious reservations about the reasonableness of premiums developed to hit a preordained target. *See Caylor Land*, T.C. Memo. 2021-30, at *45–46; *Syzygy*, T.C. Memo. 2019-34, at *34; *see also Keating*, T.C. Memo. 2024-2, at *59 (finding premiums to be unreasonable because the client "provided . . . an amount he was willing to pay or a target premium for all policies," which "played an outsized role in . . . underwriting"). Of course, "[i]t is fair to assume that a purchaser of insurance would want the most coverage for the lowest premiums." *Syzygy*, T.C. Memo. 2019-34, at *33. Consequently, we would expect an insurance purchaser "[i]n an arm's-length negotiation . . . to negotiate lower premiums instead of higher premiums." *Id.* at *33–34. But we would not expect the actuary's calculations to be influenced by nonactuarial considerations such as the captive manager's views on acceptable premiums.

V.    *Payment made by STW to CSI was not an ordinary and necessary business expense.*

Taxpayers are allowed a deduction for all ordinary and necessary expenses paid or incurred to carry on a trade or business. *See* § 162(a). Generally, amounts paid to insure against fire, storms, theft, accident, or similar losses are deductible business expenses. Treas. Reg. § 1.162-1(a). Because the amounts STW paid to CSI were not for insurance, they are not ordinary and necessary business expenses paid or incurred in connection with a trade or business; thus, STW may not deduct these payments under section 162(a). *See Swift*, T.C. Memo. 2024-13, at *44–45 (citing *Avrahami*, 149 T.C. at 199). We, accordingly, sustain

**[\*48]** respondent's determination to adjust the individual petitioners' income tax returns by disallowing these deductions.

VI.   *The advance from CSI to Shor was a constructive dividend, not a loan.*

We next consider whether the $400,000 advance from CSI to Shor was a bona fide loan or constructive dividend.[26] A loan is "an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962), *rev'g in part* 33 T.C. 572 (1959) *and Morris Plan Co. of Cal. v. Commissioner*, 33 T.C. 720 (1960)), *aff'g* T.C. Memo. 1998-121. Whether an advance from a corporation to its shareholder is a bona fide loan depends on whether, at the time the advance was made, the shareholder intended to repay the corporation and the corporation intended to enforce the obligation. *See Estate of Chism v. Commissioner*, 322 F.2d 956, 960 (9th Cir. 1963), *aff'g Chism Ice Cream Co. v. Commissioner*, T.C. Memo. 1962-6.

Courts have considered several factors relevant in ascertaining whether the parties intended to establish a debtor-creditor relationship, including:

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to

---

[26] Shor and his spouse, Theodosia, resided in California when they filed their Petition, so any appeal in their case would lie to the U.S. Court of Appeals for the Ninth Circuit unless the parties stipulate otherwise. *See* § 7482(b). We thus apply the precedent of that court, to the extent it is directly on point, to determine whether the advance CSI made to Shor was a loan or a constructive dividend for federal income tax purposes. *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). CSI's principal place of business was in Montana when it filed its Petition, so any appeal in its case would ordinarily also lie to the Ninth Circuit. *See* § 7482(b).

**[\*49]** advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

*Welch v. Commissioner*, 204 F.3d at 1230.  The factors are nonexclusive, and no single factor is dispositive.  *Id.*  On the basis of several of these factors, we conclude that the $400,000 advance from CSI to Shor was not a bona fide loan.

First, though the promissory note included a fixed maturity date and a nominal loan amortization schedule indicating $406,000 due on August 15, 2017, Shor did not comply with those terms.  He did not pay the amount due until 2020, years after the maturity date.

Second, Shor offered no collateral to secure repayment to CSI. The loan was an unsecured personal loan.

Third, there is little evidence that Shor had a reasonable prospect of repaying the loan at the time it was made.  Petitioners argue that the substantial value of Shor's interest in STW ensured he was able to repay the loan.  We are not convinced.  We construe Shor's failure to make timely payment as indicating an inability to meet his obligation.  If he could have repaid the supposed loan, it seems reasonable to think he would have.  We do not believe an outstanding $400,000 debt simply slipped his mind.  At any rate, we disagree with petitioners' assessment that this factor tips in their favor; it is neutral at best.

Fourth, the parties did not conduct themselves as if the transaction were a loan.  Yes, Shor eventually honored his debt—at his convenience.  For years, Shor behaved as though he did not owe CSI money, and CSI behaved as though it was not owed money.  Despite the unambiguous terms of the note, Shor seemed to think he did not have to repay the purported loan until CSI "demanded" it.  Yet Shor knew that, as president of CSI, it was his responsibility to collect on behalf of CSI. Repayment was made in 2020 only after these cases were docketed for trial and Shor was "flush with cash," having sold STW a few years before.

Though CSI allegedly agreed to extend the maturity date for one year to 2018, there were no formal written extensions.  But even if CSI extended the maturity date, no evidence points to its being extended beyond 2018.  Yet CSI never sought repayment after the extended maturity date elapsed in 2018, suggesting that Shor was at liberty to repay at his convenience (perhaps whenever it crossed his mind).  Such an arrangement is incongruous with a bona fide debtor-creditor

**[\*50]** relationship. *Id.* at 1231 (noting that a purported lender's failure to seek repayment is inconsistent with the existence of a bona fide loan).

In short, though the parties adhered to certain formalities (for example, the promise to repay was evidenced by an interest-bearing promissory note), in the light of Shor's failure to comply with the terms of the note and CSI's nonchalant attitude toward noncompliance, we cannot say that Shor and CSI intended to create a bona fide debtor-creditor relationship. *See Estate of Chism v. Commissioner*, 322 F.2d at 960 (explaining that the existence of a legal obligation to repay is not controlling; rather the taxpayer's intent to honor, and the corporation's intent to enforce, the obligation are determinative). We, accordingly, conclude that the advance was a constructive dividend from CSI to Shor.

VII. *Conclusion*

For the reasons set forth above, we will sustain respondent's deficiency determinations. In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decisions will be entered in due course upon completion of further proceedings.*